**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 07-36424-H1-7 |
| | § | |
| JULIET HOMES, LP | § | (Chapter 7) |
| | § | |
| DEBTOR | § | |
| | § | Case No. 07-36426-H1-7 |
| JULIET GP, LLC | § | |
| | § | (Chapter 7) |
| DEBTOR | § | |
| | | |
| IN RE: | § | Case No. 07-36422-H1-7 |
| | § | |
| DOUGLAS A. BROWN | § | (Chapter 7) |
| | § | |
| DEBTOR | § | |

_____

| | | |
|---|---|---|
| JOSEPH M. HILL, TRUSTEE | § | |
| AND W. STEVE SMITH, TRUSTEE | § | |
| | § | |
| PLAINTIFFS | § | |
| | § | |
| v. | § | Adversary No. _____ |
| | § | |
| ALEX ORIA ET AL | § | |
| | § | |
| DEFENDANTS | § | |

**TRUSTEES' ORIGINAL COMPLAINT**

TO THE HONORABLE MARVIN ISGUR, CHIEF U.S. BANKRUPTCY JUDGE:

COMES NOW, Joseph M. Hill ("Hill"), Chapter 7 Trustee of the estates of Juliet Homes,

LP and Juliet GP, LLC (collectively "Juliet") and W. Steve Smith ("Smith"), Chapter 7 Trustee

of the estate of Douglas Allen Brown ("Brown") (collectively herein  "Trustees" and

"Plaintiffs") and  files this their Original Complaint against Alex Oria, Bernie Kane, Binh Ho,

Bob Shiring, Broyd Inc. dba First Texas Residential, Caroline Brown,  Damazo Vidal, David Greenberg, Greenberg & Co., Don Sanders, Don Weir, Douglas Allen Brown, Frank Powell, Shawn Goheen, GGG Holdings LP, Hue Ho, James Counce, James Thomas, Julian Fertitta, Malladi Reddy, Melissa Thomas, Tullis Thomas, TMCM Ventures, LP, Michael Ecklund, Marquis Capital, Mir Azizi,, Muduganti J. Reddy, Najmuddin Karimjee, Saifi LLC, Robert Odom, Pinnacle Title Company, LP, Raj Rangwani, Ravi Reddy, Ray Lindgren, Richard Robert, Sanders 1998 Childrens Trust, Sanders Opportunity Fund LP, Sanjay Varma, Shreyaskumar Patel, Steve Ittner, Terry Luttrell, Thai Nguyen, Theyen Hoang, Todd Stoner, Tom Pirtle, Pirtle Investments, LP, Town Creek Partners, Vince Galeoto, Warren King, Washington Ho, and William Marsh (collectively the "Juliet Investors"), and in support thereof would show the Court the following:

**PARTIES AND SERVICE**

1. Hill is the duly appointed Chapter 7 Trustee for the estates of Juliet Homes, LP and Juliet GP, LLC.

2. Smith is the duly appointed Chapter 7 Trustee for the estate of Douglas Allen Brown.

3. Defendant Alex Oria is an individual residing in Harris County, Texas.

4. Defendant Bernie Kane is an individual residing in Harris County, Texas.

5. Defendant Binh Ho is an individual residing in Harris County, Texas.

6. Defendant Bob Shiring is an individual residing in Harris County, Texas.

7. Defendant Caroline Brown is an individual residing in Harris County, Texas.

8. Defendant Connie Brown is an individual residing in Harris County, Texas.

9. Defendant Damazo Vidal is an individual residing in Harris County, Texas.

2

10. Defendant David Greenberg is an individual residing in Harris County, Texas.

11. Defendant Don Sanders/Don Weir is an individual residing in Harris County, Texas.

12. Defendant Douglas Allen Brown is an individual residing in Fort Lauderdale, Florida.

13. Defendant Frank Powell is an individual residing in Harris County, Texas.

14. Defendant Shawn Goheen is an individual residing in Harris County, Texas.

15. Defendant Hue Ho is an individual residing in Harris County, Texas.

16. Defendant James Counce is an individual residing in Harris County, Texas.

17. Defendant James Thomas is an individual residing in Harris County, Texas.

18. Defendant Julian Fertitta is an individual residing in Harris County, Texas.

19. Defendant Malladi Reddy is an individual residing in Harris County, Texas.

20. Defendant Tullis Thomas is an individual residing in Harris County, Texas.

21. Defendant Melissa Thomas is an individual residing in Harris County, Texas.

22. Defendant Michael Ecklund is an individual residing in Harris County, Texas.

23. Defendant Mir Azizi is an individual residing in Harris County, Texas.

24. Defendant Muduganti J. Reddy is an individual residing in Harris County, Texas.

25. Defendant Najmuddin Karimjee is an individual residing in Harris County, Texas.

26. Defendant Robert Odom is an individual residing in Harris County, Texas.

27. Defendant Raj Rangwani is an individual residing in Harris County, Texas.

28. Defendant Ravi Reddy is an individual residing in Harris County, Texas.

29. Defendant Ray Lindgren is an individual residing in Harris County, Texas.

30. Defendant Richard Robert is an individual residing in Harris County, Texas.

31. Defendant Sanjay Varma is an individual residing in Harris County, Texas.

32. Defendant Shreyaskumar Patel is an individual residing in Harris County, Texas.

33. Defendant Steve Ittner is an individual residing in Harris County, Texas.

34. Defendant Terry Luttrell is an individual residing in Harris County, Texas.

35. Defendant Thai Nguyen is an individual residing in Harris County, Texas.

36. Defendant Theyen Hoang is an individual residing in Harris County, Texas.

37. Defendant Todd Stoner is an individual residing in Harris County, Texas.

38. Defendant Tom Pirtle is an individual residing in Harris County, Texas.

39. Defendant Vincent Galeoto is an individual residing in Harris County, Texas.

40. Defendant Warren G. King is an individual residing in Harris County, Texas.

41. Defendant Washington Ho is an individual residing in Harris County, Texas.

42. Defendant William Marsh is an individual residing in Harris County, Texas.

43. Defendant Pinnacle Title Company, LP is a Texas limited partnership.

44. Defendant GGG Holdings, LP is a Texas limited partnership.

45. Defendant Saifi LLC is a Texas limited liability company.

46. Defendant Broyd Inc. is a Texas corporation.

47. Defendant Greenberg & Co. is a Texas corporation.

48. Defendant TMCM Ventures, LP is a Texas limited partnership.

## JURISDICTION

49.     This Court has subject matter jurisdiction over the claims asserted in this case pursuant to 28 U.S.C. § 1334 because the claims of the Plaintiffs are claims "arising under title 11" and are claims "arising in or related to" a case under Title 11, United States Code. 11 U.S.C. § 101 *et seq.*  Pursuant to 11 U.S.C. § 1334(c), this Court has exclusive jurisdiction of the

property, wherever located, of Juliet and Brown as of the commencement of the bankruptcy cases and of property of Juliet and Brown's estates.

50.     This case arises in or is related to a case under the Bankruptcy Code.  First, under 11 U.S.C. § 541, all property of Juliet and Brown as of the petition dates, becomes part of the estates; Juliet's and Brown's property includes claims and choses in action.  Under 11 U.S.C. § 542, the Trustee has the rights and powers sufficient to prosecute claims and choses in action on behalf of the estates. Second, the majority of the liability of the estates to creditors now exists because of Juliet's and Brown's and/or their agents' transfer of assets to insiders and/or transfers made for a consideration that was not reasonable or substantially equivalent and that was made while Juliet and Brown were insolvent or had the effect of rendering the Juliet and Brown insolvent.   The Trustees sue on behalf of Juliet's and Brown's estates to recover avoidable transfers in the amounts scheduled on Exhibit "A" attached hereto and incorporated herein from the Juliet Investors pursuant to Tex. Fin. Code § 348.001 *et seq.*, Tex. Bus. & Com. Code § 9.102 *et* seq., Tex. Bus. & Com. Code §§ 24.005 and 24.006, Bankruptcy Rule 7001, 11 U.S.C. §§ 544, 547, 548 and 550.

## VENUE

51.     Venue is proper in this Court pursuant to 28 U.S.C. §1409 as a proceeding arising under title 11 or arising in or related to a case under title 11.  Venue of these proceedings is appropriate in this district because this is the district in which Juliet's and Brown's bankruptcies are pending.

## PROCEDURAL BACKGROUND

52.     On September 20, 2007, an involuntary petition for relief was filed under Chapter

11 of the United States Bankruptcy Code against Juliet Homes, LP. and Juliet GP, LLC and Brown by 5803 Richmond, Ltd., 6353 Interests, Ltd., 6409 Interests, Ltd. (collectively the "Petitioning Creditors").

53.     On October 19, 2007, Juliet and Brown filed their Motions to Convert Case from Chapter 7 to 11 and Motion to Consent to an Order for Relief from an Involuntary Petition for Chapter 7 to a Voluntary Chapter 11 under Title 11.   On October 31, 2009, Orders for Relief were entered in the causes.   Subsequently, Hill was appointed Trustee of Juliet's Chapter 11 estates.   Thereafter, on Hill's motion, Juliet's cases were converted to a chapter 7.

54.     On December 5 2007, Brown filed his Motion to Convert Case to Chapter 7.   On December 19, 2007, this Court converted Brown's case to Chapter 7.   Thereafter, Smith was appointed Trustee of Brown's Chapter 7 estate.

55.     In January 2008, Juliet and Brown filed bankruptcy schedules and statement of financial affairs.   Juliet's schedules were signed by Brown as Juliet's managing member.   Juliet scheduled creditors holding unsecured claims in excess of $7,900,000.00.

56.     The partners of Juliet (the "Juliet Partners") and percentage of partnership interest of Juliet were identified in its statement of financial affairs as follows:

| | | |
|---|---|---|
| Douglas A. Brown | Class A | 29.375 |
| Bernie Kane | Class A | 29.375 |
| HHT (1998) Limited | Class A | 5.000 |
| FCP (1988) Limited | Class A | 5.000 |
| MJ Reddy | Class B | 0.625 |
| Varma Investments Ltd. | Class B | 0.587 |
| Melisa Thomas | Class B | 0.357 |
| Gold Circle Inc. | Class B | 0.357 |
| Elizabeth C. Lemon | Class B | 0.587 |
| Christians Development Co. | | |
|   c/o Michael Benestante | Class B | 0.860 |
| 9745 Interests | | |

6

| | | |
|---|---|---|
| c/o David Greenberg | Class B | 0.860 |
| Warren King | Class B | 0.936 |
| Joon Rhee | Class B | 0.810 |
| Damazo Vidal | Class B | 1.250 |

57.    Juliet and Brown scheduled interests in 30+ partnerships or joint ventures[1] with scheduled "unknown" values (the "Juliet Project Partnerships").

58.    Juliet also scheduled nine separate bank accounts at Bank of America, First National Bank, Patriot Bank, Southwestern National Bank, and Tradition Bank with no or nominal bank deposits.

59.    Juliet reported gross income in its statement of financial affairs in the amounts of $525,694 for 2004, $1.5+ million for 2005, $24.7+ million for 2006, and $350,433 for 2007.

60.    On February 7, 2008, Hill and Smith held a joint section 341 meetings in Juliet's and Brown's cases.  The meeting was continued until March 13, 2008.  During the continued creditors' meeting, Brown testified that he was the managing partner of Juliet GP (of which he held 100% of the stock) and that Juliet GP was the general partner for Juliet LP (of which he held 40% and Bernie Kane held 40%, with the remaining interests held by other investors).

61.    On September 29, 2008, Smith filed his Original Complaint Objecting to Discharge Pursuant to 11 U.S.C. § 727 against Brown in Adversary No. 08-3320.    After

---

[1] Juliet-Midtown Village, LP, Juliet-Markle Joint Venture, Juliet-Ballpark V Joint Venture, Juliet-Ballpark V LP (Sub), Juliet-Ballpark VI LP, Silverwood Ranch Partners LP, Juliet-Silverwood LP, Juliet-Reddy LP, Juliet-Glen Haven LP, Juliet-Delano LP, Juliet-Beaumont LP, Juliet-Atascocita I LP, Juliet-Kenny LP, Magnolia at Fleur Gardens (Galeoto), Magnolia at Fleur Gardens (HO), 1400 Gray Partners Ltd. (Chau), Tuscany Woods Interests LP, 6353 Richmond Phase II, Ltd., 6353 Richmond Phase III, Ltd., Juliet-SMB, LP, Juliet-Washington Square JV, Ballpark II Joint Venture, Juliet-Ballpark II Joint Venture, Juliet-Ballpark III, LP, Juliet-Washington Square North, LP, Juliet Homes-Washington Sq N LLC, Juliet-Briarhollow, LP, Juliet Homes-Ballpark III, LLC, Juliet-Westcott II LP, Juliet Reed Road LP, Juliet Odom LP, Juliet-Pirtle LP, Juliet-Nguyen LP, Juliet Homes - Greenbush Road LLC, Juliet Development Ltd., Juliet Development GP, LLC, Juliet Signature Series, LP, Juliet East Texas Development, LP, Juliet-Dominion Court, LP, ResCon Builders, LP, ResCon Group, LLC, Juliet GP, LLC, Juliet Homes, LLC, Juliet Homes, LP, The Market On Congress, Inc., First Texas Residential, Rescon Group, LP, Rescon Builders, LLC, Juliet Purchasing Services, LP, Bentley Capital, LP, Materials Financing Specialists, LP, and Counce Custom

responding to Smith's Original Complaint, Brown subsequently agreed to waive his right to discharge as provided in Section 727(a)(10) of Title 11 of the Bankruptcy Code.

62.    On May 1, 2009, Smith and Hill filed their Motion to Approve Joint prosecution Scheme requesting authority to jointly prosecute potential causes of action of the estates. At the hearing on the Trustees' motion this court found the Trustees were acting in their respective authority for the Juliet and Brown estates.

## FACTS

### Juliet's and Brown's Residential Home Sales and Real Estate Investment Scheme

63.    Prior to its bankruptcy, Juliet was initially engaged in residential real estate development, construction and sales.  Upon information and belief, Juliet was formed as a sales and marketing company which hired third party home builders to build its homes for ultimate sale to consumers.   Juliet's primary home builder was Counce Custom Homes LP and Counce Custom Homes, GP, Inc.  (collectively "Counce").  However, in late 2005, Juliet took over control of Counce's remaining home inventory and construction draws allegedly due to Counce's failure to pay its vendors. Subsequently, Counce Custom Homes, GP forfeited its corporate charter on July 13, 2007, and Counce Custom Homes LP was voluntarily dissolved on August, 28, 2009.

64.    Rescon Builders LP and Rescon Group LLC, its general partner, (collectively "ResCon") were formed in April 2005 and December 2004, respectively, for the purpose of building homes in the state of Texas and to become the home builder for Juliet.  On August 28, 2009, Rescon ceased to exist and its business operations were "folded" into Juliet.  Rescon Group LLC forfeited its corporate charter on July 25, 2008.

---

Homes, LLC (the "Juliet Entities").                                    8

65.     To raise money for its operations, Juliet solicited cash investments from  dozens of individuals and related entities, including the Juliet Investors, most of whom were personally solicited by Juliet and invested directly with Juliet rather than through a brokerage house.  The Juliet Investors are sophisticated, well-educated individuals, familiar with the ins and outs of investing in a small business and real estate.  To induce cash investments from the Juliet Investors, Brown and/or Kane promoted Juliet as a reputable and financially profitable real estate home builder and developer of in-town communities of affordable luxury homes.  As of August 2005, Brown and/or Kane represented to potential investors that Juliet held a portfolio of 21 real estate projects with 1344 residential units and $316 million of revenue over the subsequent 40 months.  Juliet's revenues were promoted as being derived from home sales and mortgage financing via its interest in its mortgage partner Broyd, Inc. doing business as First Texas Residential ("First Texas Residential").  In reality, however, Brown and Kane used Juliet as a conduit to line their own pockets as well as those of their spouses, girlfriends, family members, "preferred investors," and other co-conspirators, all at the expense of Juliet's less sophisticated investors, lenders, customers, subcontractors, laborers, and vendors.

66.     Many of the investors were offered limited partnership interests in one or more of the Juliet Project Partnerships which were single-purpose entities formed for specific real estate development projects.  Each Juliet Project Partnership was assigned to one project.  The typical partnership agreement provided that Juliet would contribute no capital, but would retain a majority interest in the partnership.  A typical partnership agreement provided for a 50% "guaranteed" return on the investment within 14 months—a promise simply too good to be true. As an added bonus, "preferred investors" would receive kickbacks in the form of cash payments

which were disguised as "consulting fees" on Juliet's books.  Some investors were even paid directly by Pinnacle Title Company at real estate closings in order to prevent such transfers from being reflected on Juliet's books.  In other instances, Brown would withdraw cash from Juliet's bank accounts to pay "preferred investors" by money order or cashier's check.  Such payments to investors were neither reflected on Juliet's books nor reduced from their capital account.

67.     Juliet amended its partnership agreements to provide for the ability to transfer investors' funds from the assigned Juliet Project Partnership Account to an account held by TMOC (The Market On Congress, Inc.[2]) to pay for Juliet's "general expenses."  Investor funds were commingled without distinction rendering them virtually untraceable whenever returns and kickbacks were paid from any one of the numerous, commingled Juliet accounts.  Consequently, Brown and Kane were able to disburse millions of dollars in commingled funds as they pleased to line their own pockets and live lavish lifestyles while keeping the Juliet Investors happy by providing "consulting fee" kickbacks and exorbitant guaranteed returns.

68.     Juliet also had insiders, employees and other co-conspirators act as "straw buyers" in numerous "resale transactions" where kickbacks were provided to insider purchasers in the form of seller contributions, reimbursement for monies paid at closing, exorbitant monthly rental payments, and lump sum payments of $20,000.  After originating the mortgages, First Texas Residential would immediately sell them to investors on the secondary market including Wall Street investment banks such as Lehman Brothers and government-sponsored entities such as Fannie Mae.  However, after the subprime collapse in the summer of 2007, First Texas Residential was unable to continue selling these toxic mortgage loans on the secondary market.

---

[2] TMOC was incorporated in the State of Texas on November 8, 2000 but never conducted any business.  Brown and his ex-wife, Caroline Brown, held TMOC as a pass-through "shell" entity.

Consequently, Juliet's revenues were decimated and its financial condition rapidly declined. Juliet's lack of revenue, inability to attract new debt and equity capital, the lavish lifestyles of its principals, the extravagant gifts to spouses and girlfriends, and the exorbitant funds necessary to continue paying the Juliet Investors their guaranteed returns caused the real estate investment scheme to unravel.   To placate the Juliet Investors, Brown and/or Kane had Juliet issue promissory notes secured by deeds of trust in exchange for their partnership interests.   Upon information and belief, the typical promissory note included as principal the initial investment plus the promised returns.   An additional 18% interest was promised in some cases.   The terms of the promissory notes given ranged from a period of two weeks to one year.   Juliet continued to pay "consulting fees" equivalent to 10% of the initial investment regardless of whether the investor was entitled to receive a distribution at that time.   Such fees were not deducted from the balance owed, but were simply paid as "icing on the cake."

69.   Brown and Kane, as the managing members of Juliet, also fraudulently and intentionally misappropriated Juliet's funds and assets, which should have been used to pay Juliet's sub-contractors and creditors, through Juliet's affiliates for themselves and their affiliates.   Millions of dollars were funneled out of Juliet to individuals, affiliated entities, insiders and "preferred investors," while many subcontractors and vendors remained unpaid for the work performed on the residences constructed for Juliet.   Brown and Kane engaged in their fraudulent scheme for their own personal benefit and profit and for the benefit of friends, relatives and other co-consiratorsat the expense of Juliet's and Brown's legitimate creditors as follows:

(a)   Brown and Kane charged against Juliet's account exorbitant consulting

fees payable to themselves, purchased luxury vehicles and expensive personal items for themselves, their spouses, their girlfriends and other co-conspirators.

(b)     Brown and Kane issued false invoices to Juliet from fictitious vendors and subcontractors for services that were never actually performed and supplies that were never purchased.   Such companies include a nonexistent stonework company and a design firm allegedly owned by Connie Brown, Doug's mother.

(c)     Brown and his wife, Caroline Brown usedThe Market On Congress, Inc. , to divert millions of dollars belonging to Juliet through checks and wire transfers from accounts held by Juliet and Pinnacle Title.   Brown used affiliated entities including, but not limited to, TMOC, Pinnacle Title Company ("Pinnacle Title"), Broyd Inc. doing business as First Texas Residential ("First Texas Residential"), Juliet Purchasing Services, LP ("Juliet Purchasing Services"), Rescon Builders LLC and Rescon Group LP (collectively "Rescon"), Counce Custom Homes, LLC ("Counce"), Bentley Capital, LP ("Bentley Capital"), and Materials Financing Specialists, LP ("Material Financing Specialists") to funnel monies out of Juliet and to himself, insiders, the Juliet Investors and other co-conspirators.

(d)     Brown and Caroline Brown used First Texas Residential to divert funds to which Juliet was entitled at property sale closings by having Juliet pay fees for mortgage brokerage services Brown allegedly provided to homebuyers.   In reality, no such services were provided.  First Texas Residential received fees equal to 2% of the purchase price on the sale of each Juliet property, thereby reducing the proceeds available for distribution to Juliet at closing. In addition, to entice Juliet's customers not to use another mortgage company, Brown had Juliet offer to give them 42" plasma screen televisions, all of which were purchased with Juliet's funds.

12

(e)      Brown, who held an ownership interest in Pinnacle Title GP, Inc., required that all Juliet closings be handled through by Warren King of Pinnacle Title.  King, who also held an ownership interest in Juliet and in Pinnacle Title GP, Inc. through his interest in Builders Title Company GP, Inc., directed distributions of monies at closings to Brown's entities, Juliet Investors, fictitious lienholders, and other co-conspirators in order to line the Brown's and his pockets and to pay preferred investors without having such transactions reflected on Juliet's books.

(f)      Brown used Juliet Purchasing Services to place purchase orders for all building materials, and would then bill Juliet for the actual cost plus 10% (5% markup and 5% administrative fee).  The 10% profit Juliet Purchasing Services received in each transaction would then be distributed to Brown and other insiders and co-conspirators.  The inflated building costs incurred by Juliet ultimately reduced the bottom line available to pay Juliet's creditors and investors.

(g)      Closing statements reflect exorbitant real estate commissions paid by Juliet to insiders and other co-conspirators, some of which exceeded 10% of the purchase price; whereas, the average market rate in similar transaction is in the 5% to 6% range.  The excessive fees charged against Juliet's account in most closings ultimately reduced the amount of proceeds Juliet was entitled to receive.  In addition, Erica Zemaitis, Brown's girlfriend at the time, received commissions of $5,000 on numerous Juliet Homes sales transactions which were reflected on closing statements as commission paid to "Realty Associates."  Juliet would receive no benefit from the brokerage services purportedly performed by Erica Zemaitis, rather, Juliet's proceeds were merely reduced by $5,000 for her benefit.  Some of the transactions in which

13

Erica Zemaitis allegedly represented the buyer were sale transactions between Juliet and its insiders.  Clearly Juliet would not need her services to procure a buyer from within the company.

(h)     Brown testified at the Initial § 341 Creditors Meeting, that he leased the Lupton Lane (Cedarwood Sec. 1, Block 1, Lot 8, Harris County, 8617 Lupton Lane, Houston, Texas  77055) property out to Robert Odom ("Odom"), who paid the mortgage by doing purported consulting work for one or more of the Juliet Partnerships.  And, even though Odom was, in essence, living there free (purportedly as his salary), he got an additional salary from Juliet in the amount of $20,000/month, which Brown testified was money paid in advance for a project Odom was bringing to the table – a project that never came to fruition for Juliet.  Additionally, in a December 15, 2006 Receipts and Disbursements Ledger regarding the sale of a piece of property in Silverwood Ranch by Juliet LP to Lawrence H. Ramming, there are distributions to ARCOA Funding, LC in the amount of $37,500.00 and to Odom of $225,000.00.  Juliet did not receive reasonably equivalent value as a result of this transaction; rather, it was deprived of proceeds that should have first been distributed to Juliet's legitimate creditors and then to investors in amounts equal to their percentage interest in profits.

(i)     Juliet paid kickbacks to insiders, employees, relatives and other co-conspirators who acted as "straw buyers" in the purchase and sale of homes in Juliet's inventory. The typical arrangement provided that Juliet would sell the property to the person acting as the straw buyer and then lease the property back for a period of time.  The lease agreements provided that Juliet would pay the straw buyer/landlord $2,000 per month and cover all costs of ownership including monthly mortgage payments, insurance premiums, maintenance fees, and any other costs incurred as a result of owning the property.  Some agreements provided for a

14

cash payment of $20,000 at the end of the lease term.  In all instances Juliet was obligated to purchase the property back at the same price paid by the straw buyer.  Additionally, email correspondenceand bank records reflect that buyers were reimbursed for monies paid at closing including but not limited to down payments and closing costs.  These transactions were not negotiated at arm's-length and were for the personal benefit of Juliet insiders and other co-conspirators.

**Juliet's real estate investment scheme was a Ponzi scheme**

70.    From its inception, Juliet's real estate investment program had all the attributes of a classic Ponzi scheme: (1) deposits by investors, (2) little legitimate business as represented to investors; (3) the legitimate business produces little profits or earnings, and (4) payments to subsequent investors are made with prior investor funds. *Floyd v. Dunson (In Re Ramirez Rodriguez),* 209 B.R. 424, 431 (Bankr. S.D. Tex. 1997).  Over 50 investors invested in excess of $20 million with Juliet. The average rate of 'return" paid by Juliet to the Juliet Investors exceeded 25%.  Such returns were not financially feasible.  Juliet had insufficient funds from the business operations that were capable of generating funds necessary to pay the promised returns to the Juliet Investors. When funds were received from the Juliet Investors, the funds were deposited and commingled without distinction with other funds in to Juliet's operating bank accounts and/or the bank accounts of TMOC, Juliet Purchasing Services, LP, Juliet Homes, LP, Juliet Homes/Washington Square North, LLC, and Juliet Homes, LLC..   The commingled investor funds were used to pay earlier investors, operating expenses, administrative costs, and to line the pockets of Brown, Kane, and other affiliates and insiders.

**CAUSES OF ACTION**

15

71.     In each claim stated below, the averments of all other paragraphs of this Complaint are incorporated and realigned as if copied verbatim.

## FIRST CAUSE OF ACTION
## PREFERENTIAL TRANSFER UNDER 11 U.S.C. §547

72.     Pursuant to 11 U.S.C. §547(b), the Trustee may avoid any transfer of an interest of the debtor in property--

    (1)    to or for the benefit of a creditor;

    (2)    for or on account of an antecedent debt owed by the debtor before such a transfer was made;

    (3)    made while the debtor was insolvent;

    (4)    made --

        (A)    within 90 days before the date of the filing of the petition; or

        (B)    made within one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

    (5)    that payment enables such creditor to receive more than such creditor would if–

        A)    the case were a case under Chapter 7 of this title;

        B)    the transfer had not been made; and

        C)    such creditor received payment of such debt to the extent provided by the provisions of this title.

73.     Payments of Juliet were made to or for the benefit of creditors, the Juliet Investors.

74.     Transfers to the Juliet Investors were on account of an antecedent debt.

75.     Payments were made while Brown and Juliet were insolvent.

76.     Payments were made to some Juliet Investors within ninety (90) days and to insiders within one year before the petition dates in Brown's and Juliet's cases.

77.     To the extent transfers were made to the Juliet Investors within ninety (90) days or to insiders within one year, the Trustees believe that the transfers made enabled the Juliet Entities to receive more than such creditor would receive if - - (1)  the case were administered

under Chapter 7 of the Bankruptcy Code; (2) the transfer had not been made; and (3) such creditor received payment of such debt to the extent provided by the provisions of this title.

78.     Such payments constitute preferential transfers that the Trustees may avoid pursuant to 11 U.S.C. § 547.

**SECOND CAUSE OF ACTION**
**FRAUDULENT TRANSFER UNDER THE BANKRUPTCY CODE**
**AND STATE LAW**

79.     Aside from its real estate construction and sales business, Juliet developed a real estate investment scheme with numerous investors, including the Juliet Investors.  In reality, the real estate investment scheme either originated or developed into a Ponzi scheme. Funds obtained from investors were deposited and commingled with other funds into the Juliet operating accounts and the TMOC bank account and were used to pay earlier investors, Juliet's operating expenses, and insiders.  Juliet's investors fell into two categories: (1) those who advanced monies early and received "profits" and repayment of principal in excess of their advances, and (2) those who advanced monies later and received some portion of their principal and no "profits".

80.     To the extent monies were paid to the Juliet Investors from monies advanced by other pool participants and/or from monies not related to their respective Juliet Project Partnership then Juliet transferred funds to the Juliet Investors without receiving reasonably equivalent value in exchange for the transfers.  Moreover, during the period in which Juliet transferred monies to the Juliet Investors, Juliet (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which Juliet was or became, on or after the date that such transfer was made or such obligation was incurred,

17

indebted; or (B) (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Juliet was an unreasonably small capita; or (III) intended to incurred, or believed that Juliet would incur, debts that would be beyond its ability to pay as such debts matured.

### THIRD CAUSE OF ACTION
### RECOVERY OF AVOIDED TRANSFER UNDER 11 U.S.C. §550

81.     To the extent the transfers made to the Juliet Investors are avoided pursuant to 11 U.S.C. § 547 and/or § 548, the Trustees are entitled to a judgment recovering the monies under 11 U.S.C. §550.

### FOURTH CAUSE OF ACTION
### PIERCING THE CORPORATE VEIL

82.     The corporate veil of all Juliet Entities should be pierced as these entities are alter egos and have been used as a sham to perpetrate a fraud on Plaintiffs.  Upon information and belief, the Juliet Entities were organized and operated as a mere tool or business conduit of Juliet.  At all times, the entities were run by and for the personal benefit of Brown and Juliet and are the agents and instrumentalities through which they conducted business.  Thus, the Juliet Entities were nothing more than alter egos of Brown and Juliet.

83.     The Juliet Entities commingled funds, diverted company profits to Brown and other insiders for personal use, were undercapitalized, and failed to keep corporate and personal assets separate.  Juliet commingled funds from all Juliet Entities in the account held by The

Market On Congress and such funds were then diverted to Brown, affiliate entities, and other insiders.  Upon information and belief, the Juliet Enterprises were undercapitalized with the intent to defraud, hinder or delay creditors and for the purpose of enabling Brown and Juliet to control and obtain assets without performing the obligations and duties they are liable to perform.

84.     A finding of alter-ego is appropriate where the entity is used as a mere tool or business conduit of another entity or individual.  Alter-ego is shown from the total dealings of the entity and the individual.  Courts have generally described alter-ego indicia as follows:

(a)     whether the corporation has been used for personal purposes;

(b)     the amount of financial interest, ownership and control the individual maintains over the corporation;

(c)     the degree to which corporate formalities have been kept; and

(d)     the degree to which corporate and individual property have been kept separate.

85.     To perpetrate the fraud on Juliet's creditors, Brown siphoned off corporate revenues to his own benefit and to the benefit of other insiders and co-conspirators.  In addition, Brown had Juliet issue promissory notes and deeds of trust in exchange for equity interests held by investors, thereby depleting the remaining shareholder equity and ultimately rendering Juliet insolvent.

86.     The Trustees request that declaratory judgment be entered declaring that the Juliet Enterprises are alter egos of Brown and Juliet and as such, all assets owned, controlled or held by the Juliet Enterprises should be determined to be the assets of Brown and Juliet.

**FIFTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**

87.     The Trustees assert causes of action against the Juliet Investors for all equitable remedies to which they may be entitled including but not limited to unjust enrichment.  To the extent the Juliet Investors received monies from Brown and/or Juliet from sources other than a legitimate real estate investment or arms-length business transaction, the Juliet Investors have been unjustly enriched.

88.     Trustees request that the Juliet Investors be required to disgorge all monies paid by Brown and/or Juliet from sources other than a legitimate real estate investment or arms-length business transaction.

### SIXTH CAUSE OF ACTION
### RECOVERY OF ATTORNEYS' FEES AND EXPENSES

89.     Trustees request recovery of their reasonable and necessary attorneys fees and out-of-pocket expenses incurred in connection with the prosecution of the declaratory judgment action and avoidance claims.

WHEREFORE, PREMISES CONSIDERED, the Trustees requests that the Court enter judgment against the Juliet Investors as follows:

(1)     set aside the preferential and/or fraudulent transfers from Brown and/or Juliet to the Juliet Investors;

(2)      order the Juliet Investors to disgorge and turn over the monies paid to them as requested herein;

(3)     declare the Juliet Enterprise to be the alter-ego of Brown and/or Juliet;

(4)     enter a judgment against the Juliet Investors for an amount to be determined by the Court;

20

(5)      award pre-judgment interest as allowed by law; award post-judgment interest at the highest prevailing legal rate from date of judgment until paid; award all cost of court and attorney's fees;

(6)      and for such other relief, at law or equity, to which the Trustees may be justly entitled.

Respectfully submitted,

*/s/ Theresa Mobley*

_____

JOSEPH M. HILL
State Bar No. 09645500
THERESA MOBLEY
State Bar No. 14238600

OF COUNSEL:
CAGE, HILL & NIEHAUS, L.L.P.
5851 San Felipe, Suite 950
Houston, Texas 77057
Telephone:  (713) 789-0500
Telecopier: (713) 974-0344

COUNSEL FOR JOSEPH M.HILL, TRUSTEE

*/s/ Blanche D. Smith*

_____

W. STEVE SMITH
State Bar No.  18700000
BLANCHE D. SMITH
State Bar No. 00783991

OF COUNSEL:
McFALL, BREITBEIL & SHULTS P.C.
1250 Four Houston Center
1331 Lamar Street
Houston, Texas 77010
Telephone:  (713) 590-9300
Telecopier: (713) 590-9399

COUNSEL FOR W. STEVE SMITH, TRUSTEE

EXHIBIT "A"

| **Investor Name** | **Amount** |
|---|---|
| Alex Oria | $103,236.82 |
| Bernie Kane | $110,800.00 |
| Binh Ho | $800,000.00 |
| Bob Shiring | $375,000.00 |
| Broyd Inc dba First Texas Residential | $461,420.00 |
| C&B Investments (or CNB Investment) | $276,000.00 |
| Caroline Brown | $250,000.00 |
| Connie Brown | $200,000.00 |
| Damazo Vidal | $450,000.00 |
| David Greenberg | $1,000,000.00 |
| Don Sanders/Don Weir | $2,952,000.00 |
| Doug Brown | $1,000,000.00 |
| Eric Putnam | $25,000.00 |
| Erica Zemaitis Brown | $106,786.00 |
| Frank Powell | $313,884.00 |
| GGG Holdings (Shawn Goheen) | $100,000.00 |
| Greenberg & Co. | $45,000.00 |
| Hue Ho | $80,000.00 |
| James Counce | $1,000,000.00 |
| James thomas | $53,236.82 |
| Joanna Gober | $26,000.00 |
| Julian Fertitta | $1,000,000.00 |
| Malladi Reddy | $300,000.00 |
| Melissa & Tullis Thomas | $100,000.00 |
| Michael Ecklund (Marquis Capital) | $175,000.00 |
| Mir Azizi | $152,232.00 |
| Muduganti J. Reddy | $1,200,000.00 |
| Nadenne Calderon (Radford Properties) | $22,500.00 |
| Najmuddin Karimjee | $554,211.00 |
| Robert Odom | $390,857.00 |
| Pinnacle Title | $500,000.00 |
| Raj Rangwani | $137,500.00 |
| Ravi Reddy | $500,000.00 |
| Ray Lindgren | $250,000.00 |
| Richard Robert | $750,000.00 |
| Sanjay Varma | $137,500.00 |

| | |
|---|---|
| Shreyaskumar Patel | $285,000.00 |
| Steve Ittner (Lexico Distribution) | $100,000.00 |
| Terry Luttrell | $157,309.00 |
| Thai Nguyen | $250,000.00 |
| Theyen Hoang | $11,305.00 |
| Todd Stoner | $35,000.00 |
| Tom Pirtle (Pirtle Investments LP) | $750,000.00 |
| Town Creek Partners | $100,000.00 |
| Vince Galeoto | $325,000.00 |
| Warren King | $500,000.00 |
| Washington Ho | $55,934.00 |
| William Marsh | $50,000.00 |